Good morning, Council. Before we start, just to remind you of a couple things. One is we'll lock 20 minutes aside and then the appellant will have an additional five minutes for rebuttal. You don't need to reserve that time. Second, please keep your voices up. This microphone does not amplify. It merely records. Whenever you're ready, the appellant may begin. Abby Elmert Good morning, Your Honors, and may it please the Court. My name is Abby Elmert and I am here today to represent Ian Armstrong. Mr. Armstrong raised five issues on his appeal. One of those issues this Court remanded for further Krankel proceedings. I did want to update the Court that we received the transcripts of the inquiry yesterday and do intend to supplement the record with them. But today I will be focusing on the outstanding issues. Let me be clear. Are you still pursuing the Krankel issue or is that resolved? I need to review the transcripts. We just received them yesterday and then I can update the Court on if I intend to do anything further. Okay, so at this point we should assume that you're not because you didn't supplement your briefs, but you may still file a motion to do something. We're testing if I see appropriate, but today I only intend to focus on the other issues. That judgment is considered improper. Hold on one second, please. Well, I don't know. Justice Johnson raised a good question, which is, are we ready to argue? We're, I think, a little unclear about the status of the Krankel. I think that I had assumed because you didn't seek leave to supplement your brief after the remand that we were done with the Krankel issue and that there's no ineffective assistance of trial counsel issue at this point. Am I right? It's hard to say without having reviewed them yet. I'm not sure yet. I do think it's appropriate to proceed today, but it's hard to say for sure. Okay, well let me put it this way. I think if you want to pursue the Krankel issue at this point, you're going to have to file a motion that we will then allow the state to respond to and we will decide whether it's appropriate to let you pursue that because we're going to assume absent that that issue is done. Of course, I agree with that. Does that make sense? Okay.  But essentially, you then are waiving the right to oral that issue if we proceed today. I think that would be the case probably. It is. See, I like the probably. Either we're going to decide that today, then proceed, or... I mean, I think there would be a problem getting us to oral.  Anyway, so I don't think you're giving up much. We've already said oral. I don't think you'd get another right at the oral apple, which I'm not even sure is an apple. I agree. Okay. I just want to make sure she's clear and that you don't then later think, oh, I would have argued this at oral. Right. If it's a possibility, and then, you know, I think you'd need to kind of exercise it today if you wanted to continue the orals so that you could review that and include that issue. That makes sense. Does that make sense? Yeah. Yeah. Do you want to confer? I'm not presiding, but it seems to me... I am, and I'm less concerned about it. Did you, did the state want to, and we're not going to count this as your time, did the state want, you looked like you were raising your hand. Okay. All right. I'm less concerned about it because as far as I'm concerned, we said an oral. We're not going to send another oral unless we decide for some reason that we really need to hear from you on this. Yeah. And I think you may have, may have, and I'm not deciding any of this right now, forfeited your right to even pursue the crankle issue. I'm not sure. We'll wait to see if you file a motion. Yes. At this point, our assumption is the crankle issue is done without telling you you can't file a motion asking us to reconsider it further. I understand. I appreciate that. Thank you. All right. So, on the issues at our request. Yes. Now you can start. Yes. So, I do intend to argue the other issues on the appeal. Those issues all regard that Judge Hooks considered improper factors to fill the holes in the state's case and to find Mr. Armstrong guilty and to determine his sentence. First, Judge Hooks considered facts not in evidence when he found Mr. Armstrong guilty based on his own personal understanding of how wounds to the hand bleed and how that blood gets on a crime scene. Then he continued to consider his personal knowledge when he determined that the 25-year add-on for being the one who shot Dixon applied to Mr. Armstrong, even though the state had not proved this factor beyond a reasonable doubt. And finally, all of this outside-the-record information resulted in Armstrong receiving a clearly excessive 125-year sentence. So, to my first point, Judge Hooks considered facts not in evidence and his own personal knowledge when he found Mr. Armstrong guilty. Among other tangents in his verdict, Hooks based his findings of guilt on his own personal understanding of how hand wounds bleed and how gunshot wounds to the hand bleed differently based on the caliber of bullet fired. And why did any of that matter? Because, Your Honor, he used this knowledge that he says was from his time in the military to determine that the amount of blood at the scene made sense with a .22 caliber wound, which was the bullets fired. He went on a tangent about different bullet sizes could have led to different amounts of bleeding and different amount of blood at the scene. But in the end, it's blood at the scene that gives the DNA that ties it to your client. And that's the evidence that's among the most compelling evidence that puts your client at the scene, the blood. Yes, it is the central evidence at the scene. Throughout closing and throughout cross-examination, the defense argued that there was no way to know when that blood arrived at the scene or if it was there before the shooting. They argued that the amount of blood was not consistent with Armstrong being shot in the hand, which was the state's theory of how his blood arrived at the scene, was that he shot himself in the hand during the commission of the offense. And tied together with Mr. Armstrong going to the hospital and you have the nurse witness talking about the injuries that she treated Mr. Armstrong for, that tied together with the blood at the scene is fairly compelling evidence that that blood wasn't there from some other time, but was in fact there from the shooting. There's no evidence of when the blood really did arrive at the scene. This was a home that was very transient in nature. People were renting spots to sleep on the floor. The decedent was paying his rent in drugs. It's very possible that Armstrong was there at another time and that is how his blood ended up on the scene and that it didn't get cleaned up. There's too many questions here for the state to have shown beyond a reasonable doubt how his DNA did arrive at the scene. He also went to, he was at the ER much later that night, far away from, I think about an hour away from the scene of the crime. And he was wearing a different outfit than what was seen on the surveillance videos from the apartment and what was testified to by witnesses that the intruders were wearing. This all goes, just raises questions of when this blood really did, really did arrive at the scene. If it was during the shooting or if it was earlier that day during something else. And these questions are all things that need to be answered for Armstrong to have been found guilty. And Judge Post- Just to be clear, the only sufficiency argument you're making is on him being the shooter. You're not making a general sufficiency argument, I don't believe, in your briefs, correct? Yes. Okay. I did, in my briefs I have argued that Judge Hooks used improper factors in his verdict to find Armstrong guilty. But there is also a sufficiency argument on the- On being the shooter. Yes. This evidence that Judge Hooks relied on filled in the gaps in the state's case that were needed to be able to find Mr. Armstrong's, Mr. Armstrong guilty. Which was that the amount of blood at the scene and where it was found was consistent with him being shot in the hand by the bullets found. Judge Hooks spoke about his knowledge of how bullets cause wounds, how much bleeding occurs, where that blood goes. All to find that Armstrong was in fact there. And just sort of your thoughts on, you know, when we have a bench trial, we know a lot more about what the thinking of the finder of fact is. And especially if that judge is Judge Hooks, we know a lot about what his thinking is. But when does that matter? Who knows what the jury is talking about and thinking about? They're trying to put it together for themselves. He's doing the same thing. He's trying to make it all make sense for himself in terms of what happened. What's the point at which that becomes improper? Yes, Your Honor. Here the brief relies on People v. Jackson to answer that, which holds that scientific evidence needs to have been testified to at the trial. This wasn't common knowledge that any judge or juror would have from their day-to-day life. But it was scientific evidence of how wounds occur and how blood spreads across a scene that Judge Hooks relied on. Additionally, to your point about jurors, we usually do not know what jurors consider. However, if it came out that a jury had considered their personal military experience that was not evidenced at trial, it would clearly be improper that they considered this not testified to evidence to come to their verdict. But we tell the jury to consider their life experience and apply their common sense to the facts and the testimony of the witnesses, correct? Yes. So we would say that the judge can't apply her or his life experience and common sense to the evidence? Even with the jury, life experience and common sense has a limit. They're not supposed to bring in this kind of scientific evidence that is not common daily knowledge. This is scientific evidence that most judges probably do not have, and it's not the same as which directions the streets go on a map or where something is geographically. This is a different type of evidence that is open to interpretation and that needed to be testified to if it was going to be relied on repeatedly by the judge, especially where this is central to the State's case. As your honors have pointed out, this is the most compelling evidence the State has that Mr. Armstrong's DNA was found at the scene. He wasn't recognized by any of the witnesses in the apartment. There's no evidence that he knew anyone in the apartment, including the decedent. There's no evidence that he had any motive to commit the shooting, and the second person at the shooting was never identified. The central evidence here is the DNA, and to tie Armstrong and the DNA to the specific time of when the shooting occurred, the judge relied on the scientific evidence and his past experience of reading medical records in the Army to make this determination. But there's video that has two individuals coming out of the building, the taller, slender, shorter, stockier one, that tie to the time of the shooting. And then later that same day, Mr. Armstrong's being treated for a wound to his hand, along with some sooting or some black mark on his hand, all consistent with a gunshot wound. So it's just, I don't know that there's anything scientific about that, and really maybe we could, it's more, it's circumstantial evidence. But certainly, if he's being treated for a gunshot wound, hand injury, hours or the same day in which a shooting occurs, isn't that consistent with someone who was shot during a shooting, shot himself during a shooting? The facts specifically that you point to are not scientific in nature, but there's also inconsistencies within those facts. One of the witnesses in the apartment testified that it was the taller, stockier man who shot Dixon. And then when the surveillance video was shown, and the police testified, the officer who was being shown the video testified that it was the shorter, slender man who had his hand in his pocket, which the state used to show that that was the man who'd injured, that was Armstrong with an injured hand who had done the shooting. So there's inconsistency in the witness's testimony, and also that at the hospital he was wearing different clothes than at the shooting, than the men at the shooting. And the judge goes on to say, well, that's evidence that he changed outfits. Yes, and for that as well, he uses his same past experience. He said that bleeding hands were a messy situation, that he knew how hands bled and what occurred, and so that must mean because there was no blood on Mr. Armstrong's outfit at the ER that he had changed clothes, when without that outside knowledge he could have assumed that the hand wound Mr. Armstrong went to the ER for just hadn't gotten on his clothes and didn't cause blood at the scene. He used all of this outside evidence to draw conclusions that made the state's case tie together in a way that it would not have without that knowledge. I just want to stop you for one second. I believe, and I just want to clarify that you said that the sergeant testified that it was the shorter, slender person, and I believe the testimony was it was the shorter, stockier person. I was saying from memory, I do believe that is correct, but it was still a difference between the taller man being the shooter. The discrepancy was the height, but everybody agreed that the shooter or the person with the injured hand was the stockier person. Yes, but there was a disagreement about the height. Okay. And this ties in with the sufficiency argument for whether the state proved the 25-year add-on for Mr. Armstrong being the actual shooter. Judge Hooks also used this evidence to find that he was the shooter. There was no evidence that Armstrong was one of the intruders, but even if there was, there was no evidence that he ever shot or even had a gun. There were two witnesses at the scene that testified that they saw one man, the one who shot Dixon, shoot a gun. They did not testify that the other man had a gun or that he had ever shot any bullets. But there was ballistic evidence that there were two different guns fired, correct? Yes, there were two different calibers found, but there was no evidence of whether the second man did shoot or whether maybe the first shooter had two guns or, again, whether the bullets were there before the shooting. This was a house where a lot of people were coming and going and a lot of different things were happening, and it's very possible that that was there before or that the shooter had two guns. Because, am I wrong that, and this is a complicated record with a lot of, and it's a very circumstantial case for sure, but that Alexandria or Whoopi Banks testified that both men had guns? Is that not different? The state is nodding yes. Okay, do you, does that feel wrong to you? I would have to double check. I can do that, but at the very least. I can do that too. At the very least, the other witness did not testify that both men had guns and was able to testify to someone shooting Dixon, but not that they had guns, that the other man had a gun, and that on the surveillance video, neither men, it was impossible to see which men had guns. And despite the judge finding that Armstrong's wound showed that he was the shooter, whether him being shot in the hand does not show either way whether he was the shooter or the possible, the other shooter. And yet, judgments determined that Armstrong must have been the shooter because his hand was injured. But there was no testimony, again, from anyone that they saw one of the shooters get injured. There was a trail of blood leading right to the bedroom door, which was consistent with the testimony that somebody burst in the bedroom door and started shooting, correct? There was blood found around the bedroom door, yes. But it doesn't leave the apartment. It's not out in the hallway. And that's another thing about the blood evidence being inconsistent. And no one testified to what the blood, how it would have spread and what that means. And Judge Hooks used his own experience to determine, his outside experience to determine what that all means. This is the kind of evidence that, in other cases, is testified to by an expert of blood spatter and where things go. And here, there was none of that testimony. And that would have been needed to pull the state's theory together. Hooks' finding was, again, based on the theory that bleeding hands are messy. And so Armstrong must have changed his outfit before he went to the ER. And that it makes logical sense that he shot himself in the hand, even though there was no evidence of that. Here, so here, even if the state did prove that Armstrong was there, it did not prove the 25-year enhancement. Instead, there should be a 15-year enhancement for being at the scene when there was a gun, but not actually having one himself. Or, alternatively, a 20-year enhancement if the state did prove that Armstrong had a gun, but is the defense's position that that also was not proven beyond a reasonable doubt. And then finally, I'd like to discuss my last issue that Judge Hooks relied on his own personal knowledge and improper factors to impose the 125-year life sentence, which was excessive in light of Armstrong's background. Throughout sentencing, Judge Hooks continuously referenced and relied on improper factors, such as the characteristics of the decedent. He called him the purest of victims and said he was a hero. Under Illinois precedent, these are improper considerations when determining a sentence. I mean, agree with you, 125 years is a ridiculously long sentence, but the minimum sentence here, once he's found to be the shooter, is over 70 years, correct? And not a survivable sentence. So there is no survivable sentence that Judge Hooks could have given him once he found him to be the shooter, am I correct? The maximum with, if it was the 25-year add-on, would be 66 years. You mean the minimum? Sorry, the minimum, thank you.  Yes, the minimum with the 25-year add-on would be 66 years, which would put Mr. Armstrong in his 90s. So he would be very old when he got out of prison, which just goes to show that he, at that point, would not be a danger to anyone. And though it definitely is not a guarantee he would live until the end of his sentence, that has not kept this court in the past from decreasing an excessive sentence. Regardless, especially if in the future any new evidence comes to light, anything of that sort, it's always something that could end up mattering in the future, even if now it looks like he may not survive that sentence. And this minimum sentence, which would be 56 years if it was a 15-year add-on, would be much more appropriate given Mr. Armstrong's background. He did not have any previous felonies. He had misdemeanors that were at, the oldest one was, or the most recent one was 2004, but he had no previous felonies. He had his GED, and he had strong family support, and this all goes to show he has a strong rehabilitative potential. And as Your Honor pointed out, he wouldn't get out until he was in his 80s, at which point he would be a danger to no one. But really, his sentence relied on the improper factors of the judge calling his, considering that the decedent was a hero and the purest of victims. This sentencing court should not rely on the characteristics of the decedent when determining the sentence, and that was... He was certainly allowed to rely on the fact that the decedent was asleep, right? Yes, Your Honor. He is, yes. In his home. I mean, this all took place as part of a home invasion. Yes. For which he was also convicted of. Yes. Your time is up, except for your rebuttal, unless you want to summarize or come back, come back on rebuttal. I could just summarize real quickly that as judge folks relied on these improper factors at every stage of guilt and at sentencing to give, to find Armstrong guilty and give this excessive sentence for these reasons and the rest in the brief, this court should grant Armstrong a new trial or at least resentencing. Thank you. Good morning. May it please the court. I am Brenda Gibbs, Assistant State's Attorney on behalf of the people. The trial court found defendant guilty based on the trial evidence, not irrelevant information or the court's opinions, personal experience, or military experience. The court referenced its military experience with combat injuries to illustrate by analogy the severity of Dixon's injuries. When the court commented about the damage caused by different weapons, the nature of a bleeding hand, and whether defendant changed clothes between the crime scene and the hospital, it was engaging in its duty to weigh the evidence and draw inferences from the evidence. A trial judge, as Your Honor noted, does not operate in a bubble and may take into account its own life and experience in ruling on the evidence. Commenting about its life experience is not reversible error where there is no evidence that the information influenced the judgment. Viewed in the context of the court's 42-page long discussion of the evidence and its findings and rulings, the complained of comments were innocuous and did not influence the conclusion and did not form the basis for the court's determination that defendant was guilty. The court found defendant guilty because physical and circumstantial evidence established that that was so. Two eyewitnesses testified that prior to the shooting, there was no blood between Dixon's bedroom and the front door of the apartment. The court credited that testimony and considered those witnesses' descriptions of the shooter and the shooting and credited the detective's observation of the blood trail between Dixon's body and the front door. The court also observed photographs of that blood, noted the size and build of the individual depicted in the surveillance videos from the hospital and the apartment building, noted defendant's presence at the hospital a short time after the shooting with a self-reported gunshot wound to his hand that was still bleeding. Let me ask you about the gunshot. What I'm a little confused about is how being injured then indicates that he must have been the shooter. So typically the shooter doesn't, and here I am using. You're right. Not my life experience, but I would imagine that just because someone shoots or fires a gun that they would then injure themselves. I apologize. I do have experience with firearms and firing them, and I don't want to rely on that. The court did not come to that conclusion in a vacuum. It was looking at the entirety of the evidence. We have testimony that – well, we have DNA results of the defendant being at the scene, and we have DNA from the C's body to the front door, and counsel raised the question of, well, how do I know how it got there? Well, if you shoot yourself and then, using common sense, probably hurts, you're a little bit off and unsteady, you're in pain, you might use the wall to help you walk down the hallway. That's an inference we can draw from common experience in having injuries and dealing with pain. And then we notice that when he leaves the apartment, his hand is in his pocket. So that's how we have an end of a trail at the front door. He put his hand in his pocket, and that's why there's no blood trail the rest of the way out the door. These are common things that we can infer based on the evidence that's there and the evidence that's not there. Now, he goes to the hospital and says, I was shot in the hand. I just was walking, and boom, I was shot in the hand. I don't know where I was or what I was doing or how I got here. That's a little bit curious. But how do we know that someone else did not shoot him? Even if it was at the scene, that he was not shot by someone else, that he, in fact, shot himself. We have the circumstantial evidence about how the crime occurred, the proximity of the shooters to the victim, the small area in which they were when this happened. And all those circumstances can support the inference that the injury came from the shooting because his blood was there by the deceased. And that the other person, the other alleged shooter, didn't shoot him in the hand. How do we know that? We don't know that. But we don't need confirmation of that because we have circumstantial evidence that supports the court's conclusion about how the crime occurred. We have defendants DNA at the scene. We have the court's finding that the defendant matched the intruder, matched the description of the individual who left the building and then arrived at the hospital. And the court also had the ability to observe it in front of him. I guess what I'm specifically getting to is the enhancement. Okay. We can talk about the enhancement. I'm happy to. I'm going to go through the evidence upon which the enhancement was based. Okay. The medical examiner found that Dixon was shot nine times, and all of the entrance wounds and first points of contact were to the back of his body. Six shots were fired at close range, and the other three consisted of a grazed wound to his back, a grazed wound to the back of his neck, and a shot to the right side of his head, which caused a three-inch hemorrhage above his skull and a three-inch hemorrhage below his skull. Dixon died as a result of multiple gunshot wound defects to his head, brain, liver, spleen, pancreas, left kidney, left adrenal gland, third, fourth, fifth, and tenth ribs, upper left lung, arch of the aorta, pulmonary parenchyma, left ventricle of the heart, and left interventricular septum of the heart. The medical examiner removed two bullets from his body, and the remaining five shots, because two were grazed wounds, were through and through that went through the major organs that I just mentioned. Police recovered three fire bullets and four .22 caliber cartridge casings from the gun. Eyewitness testimony established that the two men who entered the apartment were armed. One was thin, and one was heavyset. The one who was heavyset kicked in Dixon's bedroom door, at which point Dixon jumped out of bed, and Mills testified that she observed the heavyset man enter the room and shoot Dixon more than six times. The court observed the surveillance videos, observed the defendant in person, considered the witness's testimony, and concluded the defendant was the heavyset individual who kicked in the door and fired the gun. The 15-year firearm enhancement attaches because he was armed with a firearm. The 20-year attaches because he discharged the firearm, and the 25-year attaches where he proximately caused the death. A defendant's criminal acts are the proximate cause of death when the acts contribute to that person's death, and the death is not caused by an intervening act unrelated to the defendant's acts. Regardless of which gun defendant fired, he proximately caused Dixon's death because Dixon died as a result of multiple gunshot wounds and not an intervening event unrelated to defendant's acts. So you're saying even if two individuals are firing, even if the evidence supports two individuals are firing, any one of those gunshot wounds proximately caused the victim's death? No, Your Honor. The medical examiner found that he died from multiple gunshot wounds, so it wasn't a fact of one bullet killed him. It wasn't this one. It wasn't that one. It was the combination. Because both shooters fired the combination of shots, both shooters were culpable for the death. But here's a little bit of my problem is your theory, and I think you put it forth in your brief as well, the evidence was there were two shooters. They're both responsible. They're both entitled to the 25-year enhancement. They both should get the 25-year. We never found the second guy, but either one of them is entitled to the 25-year enhancement. That's your position. However, I believe Judge Hooks' position was basically, I don't care what else happened, it was just a one-shooter theory. His theory was more that the heavy scent guy, and that was Armstrong, broke in and shot the deceit. Well, two points to that, Your Honor. Judge Hooks was charged with determining whether this one individual shot the victim. So he was not concerned with the other second shooter. And even if his basis of finding that there was only one shooter was incorrect, this Court can still affirm on the evidence in the record. We know that there were two shooters. We know two guns were discharged. Judge Hooks' focus was on what defendant did and whether he was the shooter, and the clerk found that he was. That's the equivalent of finding that, I'm sorry, I lost my train of thought. Finding that defendant was the shooter is no different than finding that there were two shooters who fired shots. He was one of them. So you're saying we should view him as finding that he was a shooter, not necessarily the only shooter, but that he was a shooter regardless of whether there might have been a second shooter. Correct. He was one of the shooters. There were two. He was one of them. Dixon died from multiple gunshot wounds, although defendant was properly given that enhancement of discharging the firearm that properly caused death. Would you say that Judge Hooks considered scientific evidence in making these determinations? Thank you, Ronald, for bringing me back to that. I would say no. You don't need to be a scientist to know that a bleeding hand will bleed. It's common experience that when you cut yourself, you will continue to bleed. When you are, well, when the damage to your body, your hand is more significant, the bleeding will go on longer. And again, this is something that we've experienced from a paper cut to a cut in your cuticle to something more drastic. A larger wound causes a longer bleed, and the fact that a bleeding hand will bleed was demonstrated by the evidence. He shot himself, or somehow he was shot in the hand in the apartment. There was blood there. When he arrived at the emergency room an hour later, his hand was still bleeding. So a bleeding hand, his bleeding hand, kept bleeding for that time, for the hour. The court's consideration of the changing of clothes, well, he was, again, evaluating the evidence presented to him that defended that he was shot in a remote location. If you're shot, the court mentioned, if you're shot in a remote location, one would expect you to have more blood in your clothes because you're shot and there's the bleeding. And so when you arrive at the hospital with no blood, what else could have happened but the fact that you changed your clothes? Clothes are something you can change. You can't change your nose or your ears. You can change your hair color, but you can change your clothes. These are things that people can do, and it's a common experience that this happens. So making a finding that he, or actually the court said that it wasn't considered, it wasn't going to speculate about the change of clothes after it was used about what might have happened, it doesn't matter. It's not scientific experience. It's not specialized knowledge. It's common sense that we all know. If you are bleeding and you arrive somewhere in a different outfit than the location where you were bleeding, the change of clothes is the natural conclusion from that. Counsel mentioned about the questions that were open, the difference in height and the individuals. The difference in height is less significant than the difference in someone being slender versus stocky. Difference in height can be a conclusion that is arrived at based on perspective. When Ms. Banks was in the kitchen and she observed the individuals, she observed one individual in front of her and the other at a distance. When a person is standing staggered and far away from you, you're not as able to accurately assess their height. When the officer viewed the video surveillance, the individuals were walking side by side, which is a perspective at which you can better assess the height. What's critical is that there was a slender individual and there was a stocky individual. Does any of that matter if there were two shooters? The only reason that the difference in size between the two men matters is because Judge Hooks relied on the testimony that it was the heavier set man who burst in and shot the victim. Respectfully, Your Honor, I would disagree. Judge Hooks relied on the totality of the evidence. The testimony, the video. I'm just saying, does the difference in size matter? It doesn't matter. He made an evaluation of the testimony. He evaluated the video, and he balanced that information and reached his conclusion. And it's not for this Court to substitute its judgment or the Court's judgment on that issue or on the other issues that he evaluated and balanced. If there are no further questions from the Court. I have a question on the sentencing range. Sure. Counsel suggested that the maximum sentence was, I believe she said, 66, but I think it's 76. Can you clarify what you think it is? I think it was 45 for the murder, 20 plus 25, and 31 for the home invasion, 6 plus 25. That is correct. And the home invasion is consecutive. It's consecutive, and it's an 85 percent sentence that would need to be served. So the minimum would have been 76? As you stated, yes. And even at that length of sentence and defendant's age, defendant would not have outlived his prison term. But that was not the Court's problem. The statutes for sentencing do not allow a court to ignore mandatory sentencing requirements simply because a defendant who is at an elderly age, I shouldn't say elderly, an elder age. Not a juvenile. Thank you. A defendant in his mid-30s decides to commit crimes of this nature with the consecutive sentencing with the minimum ranges and with the enhancement. It was not the Court's decision. That was defendant's decision, and the Court was bound to follow the sentencing guidelines. You can't just ignore them because there's a certain age the defendant was. They're not guidelines. They're required. They're not even guidelines. He was required to give a sentence within the range that was permitted.  Correct. So the guideline began at 76. That was where he had to start. He didn't have discretion to say, I'm going to go lower. That was where he was because defendant committed the crime at the age he did. That was what he was facing when he did that. Are there any other questions from the Court? Well, for all the reasons today and the reasons stated in our brief, I would ask this Court to affirm defendant's conviction and affirm his sentences. Thank you. Whenever you're ready. Thank you. First, I wanted to address the testimony of Banks at the trial. I don't have the transcript in front of me, so I can't say for sure what she said. But what was in the brief was that she testified that the taller, bigger guy with a handkerchief over his face was wearing a skull cap and dark clothing, that a man went into the living room and was a thin guy with darker skin and was also wearing a bandana over his mouth, and that the man in the kitchen had a gun and put up his finger to his mouth. So we can't confirm for sure what Banks testified to, but even with her testimony, there's still a question of who had a gun and who the shooter was. As Your Honors pointed out, there's no evidence that Armstrong was the shooter. The only evidence really presented was that by shooting himself in the hand, it showed he shot Dixon. But there's no real evidence of that. And I just wanted to focus lastly on the evidence that Judge Hooks relied on to find Armstrong guilty and determine that the blood at the scene was consistent with the state's theory of the case. He talked about that he was relying on his experience from reading medical reports, scientific reports, while he was in the military. He's discussed that if you had a larger weapon, like a .45 or a .357 or something of that nature, but even a .9, the blood would be all over the place from the victim, because the impact of the cartridge on the human body and the resulting squirts and the resulting flood of blood from the victim. If you stabbed someone, the blood would be squirting, but you see the .22 caliber bullet is a funny bullet. It's a bullet that has enough power to kill, to rip, to deform, to torture. He goes on continuously about the differences between a .22 bullet and these other bullets and about how hands bleed and because the nerve endings in the hands, different wounds do different things. So this was evidence that needed to be testified to at the trial to be relied on. It was not everyday life experience that the judge could bring in as the finder of fact. Counsel spoke a lot about what could have happened. That Armstrong could have changed clothes when he went to the ER. That there could have been two shooters. That both shooters could have shot at Dixon. All of these are theories of what happened without physical or testimonial evidence to back them up. And while it could be circumstantial, there are a lot of inferences that need to be made about whether this circumstantial evidence shows Armstrong was there at the shooting. About whether his blood was there at the time because he was at the shooting or from something before. There was no fingerprints found, no guns found. All that there is here is his DNA at the scene and him needing medical care that night. Counsel, there was also an expert that said that there were different caliber bullets that were fired. Yes, there were different caliber bullets found at the scene, but again, there was no evidence of exactly how each bullet came to the scene or when they did, if it was before the shooting or as a consequence of the shooting. Counsel, there were two people and there were two different caliber bullets. Okay, and so you're suggesting that perhaps some of the bullets were there already? It's possible. It's impossible to know for sure because... Refresh my recollection. Was there any evidence that with respect to the caliber of bullets that were found by the medical examiner in the victim's body? I do not believe so. I would have to double check, but I don't believe there was evidence of which bullets caused Dixon's death or any of his injuries or that it was just the 22 actually I believe was the case. The 22 bullets were found to have caused injuries, but only the one type of bullet. Because of the things that are not known here and because of the inferences that Judge Hooks had to make and relied on his own personal knowledge to make those inferences, we again ask that this Court grant Mr. Armstrong a new trial or resentencing based off of that. Thank you. Thank you. Thank you, Counsel. Thank you both. This was a complicated case with lots of issues, very well briefed, very well argued. We will take this under advisement and you will hear from us in due course.